Rafael Leyva, Iris Ramos y Carl Leyva Ramos, demandantes y recurridos, *v.* Policías Juan L. Aristud, Ramón Lacén Carrasquillo, Juan Rosa Castro y el Estado Libre Asociado, recurrentes los últimos dos.

*Número:* RE-88-573 *Resuelto:* 19 de enero de 1993

*Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Procuradora General Interina, y Miriam Álvarez Archilla, Procuradora General Auxiliar,* abogados del recurrente; *Roberto Roldán Burgos,* del *Instituto Puertorriqueño de Derechos Civiles,* y *Héctor F. Oliveras,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El Procurador General de Puerto Rico (Procurador General) solicita que revoquemos la sentencia del Tribunal Superior que declaró con lugar la demanda de daños y perjuicios por violación de derechos civiles presentada contra el Estado Libre Asociado de Puerto Rico (E.L.A.) y el Comandante de Área de Carolina, Teniente Coronel Juan Rosa Castro (Rosa Castro), al amparo de la sec. 1983 de la Ley federal de Derechos Civiles, 42 U.S.C., y los Arts. 1802 y 1803 del Código Civil de Puerto Rico (Código Civil), 31 L.P.R.A. secs. 5141 y 5142. En específico, tenemos que interpretar si según la sec. 1983 de la Ley federal de Derechos Civiles, *supra,* y el Art. 1802 del Código Civil, *supra,* Rosa Castro y el E.L.A. son responsables, porque en la supervisión de sus subalternos no se tomaron las medidas necesarias para prevenir que unos policías violaran los derechos civiles de un ciudadano.

Al analizar los hechos del caso de autos, tenemos en mente las expresiones siguientes de la Comisión de Derechos Civiles de Puerto Rico:

> El policía es el contacto más directo entre la ciudadanía y el ordenamiento jurídico-penal del país. Hay que reconocer que su

labor es delicada y que requiere una gran dosis de tacto, sin que por ello deje de ser firme y eficiente. En el desempeño de sus funciones el uso de la fuerza física depende en gran medida de un juicio personal del agente frente a situaciones cargadas de gran emocionalidad y tensión nerviosa. Atendiendo a este primordial y delicado aspecto de la labor policíaca resulta evidente que un agente que demuestre una propensión a la agresión física injustificada contra otras personas no puede considerarse apto para la tarea de velar por el orden y la tranquilidad de la comunidad. Informe Especial de la Comisión de Derechos Civiles de Puerto Rico, *Los derechos civiles y las intervenciones de la Policía con los ciudadanos*, XXXVII (Núm. 1) Rev. Jur. U.P.R. 205, 247 (1968).[1]

I

Según surge de la prueba estipulada por las partes, el 15 de marzo de 1983 los policías codemandados de la División de Tránsito de Carolina, Juan L. Aristud (Aristud) y Ramón Lacén Carrasquillo (Lacén), estaban francos de servicio y viajaban en el vehículo privado de Lacén por la carretera estatal Núm. 3. Mientras viajaban por el pueblo de Loíza, su carro fue impactado por otro vehículo. Al presenciar el accidente, el menor de edad Carl Leyva Ramos (Leyva Ramos) se bajó de su vehículo, se dirigió al de Lacén y les comentó: "¡a lo que conduce la prisa!" (*Exhibit* I, pág. 3), refiriéndose a la persona que acababa de impactar al carro de los policías. Este inocente comentario provocó que los policías iniciaran el lamentable episodio de violencia física y verbal que origina el caso de autos.

Por aparentemente entender que el menor se refería a ellos, Lacén y Aristud le contestaron de forma ofensiva y

---

[1] Las estadísticas de la Comisión de Derechos Civiles reflejan un aumento en los casos de brutalidad policiaca. Esta es una modalidad del abuso policiaco en que un funcionario del orden público, so color de autoridad y sin causa justificada, inflinge daño físico o emocional a una persona. Dicha conducta es constitutiva de delito tanto a nivel federal como estatal. 18 U.S.C. sec. 242; 33 L.P.R.A. secs. 4032 y 4182. Entre las manifestaciones más frecuentes de este tipo de abuso se encuentran las agresiones físicas por oficiales fuera de sus funciones de trabajo. Boletín de Derechos Civiles, Comisión de Derechos Civiles, Núm. 3, 1992, págs. 6–8.

agresiva. Cuando, desconcertado por su actitud, el joven les preguntó por qué le contestaban así, Lacén lo golpeó con un puño. Naturalmente sorprendido y asustado, Leyva Ramos les cuestionó por qué le agredían, a lo que recibió como contestación más agresiones. Cuando el joven trató de defenderse, los policías lo tiraron al piso, lo patearon en la cara y lo agarraron por el cuello, casi asfixiándolo. Finalmente, cuando el público que estaba allí aglomerado acudió en auxilio de Leyva Ramos, los agentes revelaron que eran miembros de la Policía de Puerto Rico (en adelante Policía). Inmediatamente procedieron a arrestar al demandante.

Posteriormente, el oficial Carlos Velázquez, de la División de Tránsito de Carolina, se presentó al lugar en una patrulla y junto con Lacén y Aristud condujeron al joven a la División de Tránsito de Carolina. Allí lo interrogaron y lo amenazaron con continuar pegándole si no guardaba silencio. A pesar de las laceraciones que había sufrido en el cuerpo, la Policía no le ofreció ningún tipo de asistencia médica a Leyva Ramos.

Cuando el Sr. Rafael Leyva, padre del menor, se presentó en el cuartel le informaron que someterían cargos por agresión contra su hijo. Más tarde, Lacén y Aristud promovieron la presentación de una denuncia por agresión agravada en contra de Leyva Ramos. Eventualmente, el agente Carlos Velázquez sometió una denuncia contra Leyva Ramos en la cual le imputó el delito de agredir a un funcionario del orden público. Ésta fue sometida por el agente Carlos Velázquez.(²)

---

(²) En dicha denuncia le imputaron a Carl Leyva Ramos que "ilegal, voluntaria, maliciosa y criminalmente a sabiendas y con la intención criminal de causar daño corporal en la persona de un ser humano como lo es el AGTE. JUAN L. ARISTUD 10512, *el cual es un agente del Orden Público*, Policía Estatal, sin causa legal que lo justificara, utilizando fuerza y violencia acometió y agredió con los puños en la boca resultando con laceración en dicho lugar. No ha recibido asistencia médica.

"Agravante: Alegado en este caso consistente en que el agresor llevó a cabo dicha agresión contra un funcionario público de la Policía de Puerto Rico". (Énfasis

Como resultado de esta acción, Rafael Leyva y su hijo tuvieron que trasladarse en una patrulla al Centro Judicial de Hato Rey. Tras negársele permanecer con su padre, el menor fue recluido en el cuarto de arrestados hasta las 3:30 de la madrugada donde otros oficiales, alentados por los agentes Aristud y Lacén, lo amenazaron y se mofaron de él. Cuando finalmente se llamó el caso para vista, Leyva Ramos tuvo que ser dejado en libertad, pues Aristud y Lacén habían desaparecido. En total, esta sucesión de eventos duró alrededor de siete (7) horas.

Posteriormente, el menor fue citado para comparecer a una vista preliminar ante el Tribunal de Distrito de Loíza el 19 de marzo de 1983. Allí, los policías Aristud y Lacén declararon como testigos de cargo. Al determinarse no causa, éstos insistieron en que el Fiscal sometiera el caso a vista preliminar en alzada, donde volvieron a declarar. Nuevamente el tribunal determinó que no existía causa probable.

Por estos hechos, Rafael Leyva e Iris Ramos, por sí y en representación de su hijo menor Leyva Ramos, presentaron una demanda civil en daños y perjuicios por violación de sus derechos constitucionales y civiles. Nombraron como demandados al E.L.A., a los policías Aristud y Lacén y al Comandante de Área de Carolina, el Teniente Coronel Rosa Castro, todos éstos en su carácter personal y oficial. En la demanda alegaron que los demandados violaron sus derechos constitucionales mediante unos actos intencionales, negligentes o mediando negligencia crasa, actuando so color de autoridad oficial.

En específico, alegaron que el Teniente Coronel Rosa Castro era Comandante de Área de Carolina y, como tal, responsable de supervisar a los policías codemandados; que éste tenía o debió haber tenido conocimiento del carácter violento de los policías codemandados. Alegaron, ade-

---

suplido.) *Exhibit* VI, pág. 41.

más, que Rosa Castro y el E.L.A. fueron negligentes al no adiestrar ni supervisar adecuadamente a los policías para desempeñar sus funciones. Sostuvieron que, a pesar de que los codemandados eran propensos a cometer actos de violencia, ni Rosa Castro ni el E.L.A. tomaron suficientes medidas disciplinarias para evitar hechos como los aquí ocurridos.

Según los demandantes, esta conducta crasamente negligente de Rosa Castro y del E.L.A. contribuyó a la formación de una actitud contraria a las leyes y a las Constituciones de Puerto Rico y Estados Unidos entre los miembros de la Policía en Carolina, "en detrimento de los derechos constitucionales y la salud y seguridad física y mental de la ciudadanía en general y de los co-demandantes en específico". Escrito en oposición a recurso de revisión, pág. 25.

Por haber incumplido ciertas órdenes del tribunal, se anotó la rebeldía de Aristud y Lacén. De los autos no surge que éstos hubieran solicitado o que en algún momento les fuera provista representación legal a través de los abogados del Estado. Por su parte, Rosa Castro solicitó representación legal al Departamento de Justicia al amparo de la Ley Núm. 9 de 26 de noviembre de 1975 (32 L.P.R.A. sec. 3085).([3])

En su sentencia el tribunal de instancia concluyó que más que sospecha razonable de la actitud agresiva, peligrosa y abusiva de Aristud y Lacén, Rosa Castro, la Policía y el Estado tenían conocimiento directo de las múltiples agresiones de estos oficiales a ciudadanos inocentes, y que

---

([3]) Esta sección dispone, en lo pertinente:

"Todo funcionario, ex funcionario, empleado o ex empleado del Estado Libre Asociado de Puerto Rico que sea demandado en daños y perjuicios en su carácter personal, cuando la causa de acción se base en alegadas violaciones a los derechos civiles del demandante, debido a actos u omisiones incurridos de buena fe, en el curso de su trabajo y dentro del marco de sus funciones, podrá solicitar que el Estado Libre Asociado de Puerto Rico le provea representación legal y posteriormente asuma el pago de cualquier sentencia que pueda recaer sobre su persona."

a pesar de ello no tomaron las medidas necesarias para corregir tal conducta y prevenir futuros incidentes de violencia. *Exhibit* I, pág. 18. Entendió, además, que Rosa Castro y el E.L.A. "propiciaron y fomentaron la conducta agresiva de estos oficiales al permitir que los mismos salieran airosos a pesar de cometer todas las fechorías y conducta delictivas (sic) en que incurrían mientras prestaban servicios para el Cuerpo de la Policía. Las suspensiones de empleo y sueldo ... obviamente no frenaron ni evitaron la ocurrencia de los hechos que motivan esta demanda. Ningún efecto positivo tuvo en los co-demandados Aristud y Lacén". Íd., págs. 18–19. Determinó, además, que "[e]ra preciso una supervisión más efectiva y en última instancia, separación oportuna del cuerpo que en forma tan vil denigraron con su conducta". Íd., pág. 19.

Por considerar que las omisiones de Rosa Castro constituyeron negligencia en el desempeño de sus funciones de supervisión, el tribunal de instancia le impuso responsabilidad en su carácter personal y oficial según la Ley federal de Derechos Civiles. Además, determinó que el E.L.A. era responsable de acuerdo con esta ley y con la Ley Núm. 104 de 29 de junio de 1955 (32 L.P.R.A. secs. 3077–3084 y 31 L.P.R.A. sec. 5142) por los actos negligentes de Rosa Castro. No obstante, no responsabilizó al Estado por las actuaciones intencionales de los policías.[4]

El tribunal también impuso responsabilidad a Aristud y a Lacén en su carácter personal en conformidad con la Ley federal de Derechos Civiles. Expresó que a pesar de que inicialmente éstos se encontraban francos de servicio, actuando so color de autoridad en el momento en que ocurrie-

---

[4] El Estado no autoriza las demandas en su contra si están fundadas en los actos de sus empleados, agentes o funcionarios constitutivos de acometimiento, agresión, arresto ilegal, persecución maliciosa o encarcelamiento ilegal. Art. 6(d) de la Ley Núm. 104 de 29 de junio de 1955, 32 L.P.R.A. sec. 3081(d). Por esto, el tribunal de instancia no impuso responsabilidad al Estado a base de los actos de los policías Aristud y Lacén. En esos casos, de ordinario, sólo responden los agentes en su carácter personal. *Cf. Galarza Soto v. E.L.A.*, 109 D.P.R. 179 (1979).

ron los hechos y en funciones como policías, "arrestaron ilegal y viciosamente a ... Carl Leyva Ramos, le restringieron su libertad y le acusaron viciosamente por cargos criminales" en violación de sus derechos civiles. *Exhibit* I, pág. 19. Al analizar integralmente las actuaciones de los agentes del orden público, el Tribunal Superior concluyó:

> La agresión sufrida por Carl en manos de estos policías, su posterior arresto ilegal, el trato recibido en el Cuartel de Tránsito de Carolina, y el trato recibido en el Centro Judicial de Hato Rey y las acusaciones viciosas a (sic) que fue objeto son causas suficientes para estremecer la conciencia civilizada y es una mancha en nuestra cultura la cual está dirigida por un avanzado orden constitucional de reverencia por la vida y todos los demás derechos fundamentales del hombre. *Exhibit* I, pág. 21.

Finalmente, el tribunal impuso responsabilidad solidaria al E.L.A., al Teniente Coronel Rosa Castro y a Aristud y Lacén. Condenó a éstos a satisfacer a Leyva Ramos la suma de $20,000 por sus daños, lesiones y sufrimientos físicos, más $30,000 por sus angustias y traumas mentales. También los condenó solidariamente a pagar al Sr. Rafael Leyva $15,000 y a la Sra. Iris Ramos González $10,000, padre y madre del menor, por sus angustias y traumas mentales. Por otro lado, les impuso el pago de $980 por los gastos especiales en los cuales incurrió la sociedad de gananciales de Rafael Leyva e Iris Ramos y $8,000 por honorarios de abogados según la Ley federal de Derechos Civiles.

De esta sentencia acuden ante nos los codemandados Rosa Castro y el E.L.A. En su escrito aceptan la mayoría de los hechos esenciales, los cuales fueron estipulados, pero niegan que Aristud y Lacén estuvieran en funciones el día de los hechos. Además, alegan, en síntesis, la comisión de los errores siguientes: (1) que erró el tribunal de instancia al imponerles responsabilidad conforme la sec. 1983 de la Ley federal de Derechos Civiles, 42 U.S.C., y los Arts.

1802 y 1803 del Código Civil de Puerto Rico; (2) que de haber incurrido en negligencia el codemandado Rosa Castro, ésta no fue la causa próxima de los daños; (3) que erró el tribunal al imponer responsabilidad solidaria, pues el Art. 6 de la Ley Núm. 104, *supra*, 32 L.P.R.A. sec. 3081, impide que se imponga responsabilidad al Estado por actos de sus funcionarios constitutivos de agresión, encarcelación o arresto ilegal y persecución maliciosa; (4) que una vez se dictó sentencia contra el Estado, no podía dictarse sentencia solidaria en contra de Rosa Castro por la misma materia o cuestión que dio origen a la acción por impedirlo el Art. 8 de la Ley Núm. 104, *supra*, de Reclamaciones y Demandas contra el Estado, y (5) que erró al imponerle honorarios de abogado, pues ese mismo artículo prohíbe la imposición de honorarios al Estado y tampoco procede que se impongan según la Ley federal de Derechos Civiles, por no haber responsabilidad de acuerdo con esa ley.

## II

En primer lugar, el Procurador General sostiene que el foro de instancia se equivocó al imponerle responsabilidad al Teniente Coronel Rosa Castro conforme la sec. 1983 de la Ley federal de Derechos Civiles, *supra.*

 Al interpretar el estatuto federal, tenemos presente que este Foro tiene jurisdicción concurrente con las cortes federales para juzgar los litigios surgidos al amparo de esa ley. *Acevedo v. Srio. Servicios Sociales*, 112 D.P.R. 256, 259–260 (1982). El Tribunal Supremo de Estados Unidos ha resuelto que los tribunales estatales pueden asumir jurisdicción sobre la materia de una causa de acción federal excepto cuando existe un estatuto del Congreso que dispone lo contrario o cuando existe una incompatibilidad incapacitante entre el pleito federal y su adjudicación en las cortes estatales. *Howlett v. Rose*, 496 U.S. 356 (1990); *Gulf*

*Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477–478 (1981). Véanse, además: *Martínez v. California*, 444 U.S. 277, 283 n. 7 (1980); *Maine v. Thiboutot*, 448 U.S. 1, 3 n. 1 (1980).([5])

La sec. 1983 de la Ley federal de Derechos Civiles, *supra*, es un vehículo para que los ciudadanos puedan hacer valer los derechos que confieren la Constitución y las leyes de Estados Unidos frente a aquellas personas que abusan de su poder cuando actúan so color de autoridad estatal. *Baker v. McCollan*, 443 U.S. 137 (1979); *Graham v. Connor*, 490 U.S. 386, 394 (1989); 1 *Steinglass, Section 1983: Litigation in State Courts* Sec. 2.5 (1993). Mediante este estatuto, el Congreso puso "en vigor las disposiciones de la Décimocuarta Enmienda en contra de aquellas personas que portan la insignia de la autoridad estatal y representan la misma en cualquier capacidad, ya sea actuando de acuerdo a dicha autoridad o haciendo uso indebido de la misma". *Monroe v. Pape*, 365 U.S. 167, 171–172 (1961). Véanse, además: *Scheuer v. Rhodes*, 416 U.S. 232, 243 (1974); *Hafer v. Melo*, 502 U.S. 21, 116 L.Ed. 2d 301 (1991). Esta sección dispone:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

---

([5]) El propio Tribunal Supremo de Estados Unidos ha reconocido que permitir a las cortes estatales que resuelvan las causas de acción federales facilita el proceso de hacer valer los derechos federales. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478 n. 4 (1981). Al ser ésta una causa de acción federal sobre la cual ejercemos jurisdicción concurrente, estamos obligados a seguir nuestras propias opiniones anteriores y las decisiones del Tribunal Supremo de Estados Unidos. Véanse: *Seibring v. Parcell's Inc.*, 532 N.E.2d 1335 (1988); 1 *Steinglass, Section 1983: Litigation in State Courts* Sec. 5.4 (1990); D.J. Meltzer, *State Court Forfeitures of Federal Rights*, 99 (Núm. 2) Harv. L. Rev. 1130, 1231 (1986); D.L. Shapiro, *State Courts and Federal Declaratory Judgments*, 74 N.W. U.L. Rev. 759, 771 (1979); R.M. Cover and T.A. Aleinikoff, *Dialectical Federalism: Habeas Corpus and the Court*, 86 Yale L.J. 1035, 1053 (1977).

party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia. 42 U.S.C. sec. 1983.

A tenor con la jurisprudencia federal, para que un demandante pueda prevalecer en una acción por violación de derechos civiles según este estatuto, debe demostrar que el demandado actuó so color de autoridad y que esta actuación lo privó de los derechos garantizados por la Constitución y las leyes de Estados Unidos. Véanse: *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), revocado en otro aspecto en *Daniels v. Williams*, 474 U.S. 327 (1986); *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406, 408 (2do Cir. 1990); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1er Cir. 1989); *Roman Figueroa v. Torres Molina*, 754 F. Supp. 239 (D. P.R. 1990).

En el caso específico de los supervisores, la imposición de responsabilidad no se hace a base de la doctrina de responsabilidad vicaria, ya que tanto él como sus subalternos trabajan para un mismo patrono: el Estado. *Gutierrez-Rodriguez v. Cartagena*, supra, pág. 562. Su responsabilidad está fundada en los actos u omisiones en el desempeño de sus funciones de supervisión. Íd.; *Figueroa v. Aponte-Roque*, 864 F.2d 947, 953 (1er Cir. 1989); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 901–902 (1er Cir. 1988).

Ahora bien, la mayoría de las cortes federales han rechazado que un supervisor sea responsable por una mera negligencia en el desempeño de la supervisión de sus subalternos y han adoptado una norma más rigurosa al invocar la protección de la sec. 1983 de la Ley federal de Derechos Civiles, *supra. Leite v. City of Providence*, 463 F. Supp. 585 (D. R.I. 1978); *Witt v. Harbour*, 508 F. Supp. 378 (1980); *Languirand v. Hayden*, 717 F.2d 220 (5to Cir. 1983); *Lenard v. Argento*, 699 F.2d 874 (7mo Cir. 1983).

Conforme a la doctrina de la mayoría que hoy adoptamos, para que la dejadez del supervisor active la protección de la citada sec. 1983, sus actos u omisiones deben reflejar una indiferencia imprudente o insensible (*reckless or callous indifference*) a los derechos constitucionales del demandante, o un comportamiento que pueda ser calificado como condonación o aquiescencia en la supervisión, que pueda caracterizarse como negligencia grave.([6]) *Haynesworth v. Miller*, 820 F.2d 1245 (Cir. D.C. 1987); *Sims v. Adams*, 537 F.2d 829, 832 (5to Cir. 1976); *Germany v. Vance*, 868 F.2d 9, 18 (1er Cir. 1989); *Gutierrez-Rodriguez v. Cartagena*, supra; *Lipsett v. University of Puerto Rico*, supra, pág. 902.

■ Al hacer esta determinación, el tribunal deberá eva-

---

([6]) La Corte de Apelaciones de Estados Unidos para el Distrito de Columbia, en *Haynesworth v. Miller*, 820 F.2d 1245, 1260–1261 (Cir. D.C. 1987), recientemente resumió el alcance de esta doctrina:

"Applying the tenets of *Rizzo*, numerous courts have concluded that something more than mere negligence on the part of the supervisor is necessary to state a claim under *Bivens* or Section 1983. These courts have asserted that, in order to construct a basis for liability, the injured party must establish that the supervising official was either 'grossly negligent' or 'deliberately indifferent' in failing to take precautions against the constitutional violation that did in fact occur. This standard of culpability for supervisory officials has been justified by a recognition that imposition of a duty of care to prevent all foreseeable misconduct by subordinates would thrust an excessive burden on supervisors and hamper performance of official duties. Despite differences in articulations of the applicable standard and the underlying rationale, the overwhelming majority of courts faced with claims of supervisory liability after *Rizzo* have determined that, where responsibility is predicated on inattentiveness rather than affirmative misconduct, *the plaintiff must establish a high degree of fault in order to implicate the supervisor in the constitutional infractions of his subordinates.*

"We... join the majority of courts calling for something more than mere negligence to forge the 'affirmative link' between the constitutional infringement and the supervisor's conduct. Consideration of the exigencies of criminal law enforcement also suggests that a higher standard is appropriate, given the wide range of constitutional breaches arguably 'foreseeable' in the daily operations of a law enforcement agency, and the difficulty of providing meaningful guidance to ward off all possible wrongs. *The duty to supervise is triggered by proof that, absent effective supervision, harm was not merely foreseeable, but was highly likely, given the circumstances of the case. When inaction in the face of a substantial threat of harm is shown, it can be said that the supervisor acquiesced in the resulting constitutional violation, thereby 'linking' the non-feasance with the injury in the manner required by Rizzo.*" (Escolios omitidos, énfasis suplido y en el original.)

luar la prueba a los fines de determinar si el demandante demostró, mediante preponderancia de la prueba, que el supervisor tenía conocimiento previo de actos ilícitos de su subalterno y mostró indiferencia imprudente o insensible a los derechos constitucionales de los ciudadanos al no tomar las medidas correctivas apropiadas y necesarias para evitar la recurrencia de estos actos. *Lipsett v. University of Puerto Rico*, supra, pág. 902.

■ Un acto aislado no es suficiente para invocar la protección de la sec. 1983 de la Ley federal de Derechos Civiles, *supra*. Se requiere que el supervisor tuviera conocimiento previo de varias actuaciones ilegales y abusivas de su subalterno o que hubiese estado presente en alguna de las ocasiones en que se violaron los derechos de un ciudadano. *Wilkinson v. Ellis*, 484 F. Supp. 1072 (D. Penn. 1980); *Bowen v. Watkins*, 669 F.2d 979 (5to Cir. 1982).

■ También hay que probar que él tenía la responsabilidad de supervisar los empleados y que, mediante sus propios actos u omisiones, permitió que sus subordinados violaran los derechos constitucionales del demandante. No es necesario que el supervisor haya despojado al demandante de sus derechos constitucionales mediante sus propias manos. Puede ser también responsable cuando ayuda a otros o cuando omite ejercer un deber impuesto. Lo mismo ocurre si pone en movimiento una cadena de eventos o actuaciones de otros que debió prever que causarían daño al demandante. *Springer v. Seamen*, 821 F.2d 871, 879 (1er Cir. 1987); *Gutierrez-Rodriguez v. Cartagena*, supra. El nexo causal se demuestra mediante la prueba de un "ligamen causal afirmativo" (*affirmative links*) entre sus actos y el daño causado por sus subalternos. *Rizzo v. Goode*, 423 U.S. 362 (1976); *Lipsett v. University of Puerto Rico*, supra; *Gutierrez-Rodriguez v. Cartagena*, supra; M. Avery y D. Rudovski, *Police Misconduct, Law and Litigation*, 2da ed., Illinois, Ed. Clark Boardman Callaghan, Sec.

3.4(c)(5), pág. 3-13. Por último, hay que demostrar que como resultado de su indiferencia los demandantes sufrieron un daño. Examinada la normativa anterior, corresponde aplicarla a los hechos de este caso.

### III

De la prueba documental que obra en los autos se desprende que los policías Lacén y Aristud fueron admitidos a la Policía para 1978 y 1980, respectivamente. También surge que Lacén fue admitido a la Policía sin haber aprobado el examen sicológico requerido a todos los aspirantes.[7]

El 3 de febrero de 1982 el guardia Lacén fue trasladado de la División de Drogas y Narcóticos de Carolina a trabajar como uniformado en el Distrito de Río Grande. El traslado respondió a una queja del Teniente Domingo Álvarez Díaz (Álvarez Díaz), Director de la División de Drogas y Narcóticos de Carolina, a la Comandancia de Área. Adujo éste en su queja que Lacén agredía a los ciudadanos y representaba un riesgo para los agentes encubiertos de su división. Mencionó que en una ocasión, uno de los supervisores de ronda le había pedido que no le asignaran a Lacén porque "en 3 ocasiones viciosamente [sic] había agredido [a] tres ciudadanos dándole con la culata del revólver rajándole la cabeza". *Exhibit* VI, pág. 60. La investigación realizada por el Negociado del Servicio de Inspección de Asuntos Disciplinarios de la Policía de la Oficina del Superintendente (Negociado) encontró que en una ocasión Lacén había respondido a una agresión de un ciudadano

---

(7) La Sec. 12.2(5) del Reglamento de Personal de la Policía de Puerto Rico de 1981 (en adelante Reglamento de Personal) dispone que "[t]odo candidato a ingreso a la Policía de Puerto Rico tendrá que pasar exámenes físicos y sicológicos, así como cualesquiera otros exámenes o pruebas que determine el Superintendente". La Sec. 12.7(b)(1) del citado reglamento dispone que los candidatos a ingreso deberán cumplir con estos requisitos. De no cumplirlos, la selección del candidato podrá ser cancelada. Íd., Sec. 12.8(2).

golpeándolo con el revólver de reglamento. Esta actuación de Lacén constituyó una violación a la Sec. 14.5(40)(f) del Reglamento de Personal de la Policía de Puerto Rico de 1981 (en adelante Reglamento de Personal), y era una falta grave. Enterado de los hallazgos del informe, el entonces Comandante de Área, Teniente Coronel Catalino Hernández Class, transfirió a Lacén a la División de Tránsito. Sin embargo, de los autos no se desprende que el Superintendente Desiderio Cartagena (Superintendente) tomó alguna medida disciplinaria en su contra ni que adoptó medidas cautelares para evitar su repetición.

De la prueba en instancia también surge que el 23 de junio de 1982 se completó una investigación administrativa de una querella presentada en contra de Lacén. En específico se alegó que el policía, a pesar de estar franco de servicio, presentó una denuncia contra un ciudadano a sabiendas de que los hechos imputados eran falsos. La investigación de este suceso reveló que Lacén había presentado la denuncia como represalia por el ciudadano haberse querellado de que el agente pasaba en su automóvil privado a alta velocidad y con ruidos innecesarios por la urbanización donde residían ambos. Dicha actuación también era constitutiva de una falta grave por violar la Sec. 14.5(5) del Reglamento de Personal, *supra*.

Informado de los resultados de la investigación, Rosa Castro, ahora el Comandante de Área de Carolina, recomendó una sanción de sesenta (60) días de suspensión de empleo y sueldo. Sin embargo, el Superintendente impuso solamente una suspensión de empleo y sueldo de treinta (30) días. Al concluir este período, Lacén fue nuevamente reincorporado a la División de Tránsito de la Comandancia de Carolina sin ningún tipo de apercibimiento. Tampoco recibió instrucciones especiales del Superintendente o de la Comandancia de Carolina de que las agresiones a ciudadanos constituyen una violación de los derechos civiles. No se le ofreció un adiestramiento especial que lo capacitara

para intervenir con ciudadanos ni se requirió que recibiera consejería especializada en conducta humana. Todo esto a pesar de que éste tenía un historial que mostraba una tendencia a cometer actos de violencia física y verbal injustificada contra la ciudadanía.

En cuanto al policía Aristud, también surge de los autos un historial caracterizado por problemas de conducta.[8] En septiembre de 1982, a raíz de una recomendación del Teniente Álvarez Díaz, su supervisor en la División de Drogas y Narcóticos de Carolina, Aristud fue trasladado a la División de Tránsito. Al igual que con Lacén, el Teniente Álvarez Díaz solicitó el traslado de Aristud por las agresiones perpetradas contra ciudadanos desde que llegó a la División de Drogas y Narcóticos, y porque era considerado un riesgo para el resto de los demás agentes. A pesar de este historial, el anterior Comandante de Área lo trasladó a la División de Tránsito donde, por la naturaleza de sus funciones, tenía que entrar en contacto con la ciudadanía en circunstancias normalmente tensas. De los autos no surge que Rosa Castro intervino en esta decisión ni que estaba enterado de su contenido.

En enero de 1983, mientras se desempeñaba como policía de tránsito, Aristud desplegó una conducta abusiva al intervenir con un ciudadano para expedirle un boleto. Por estos hechos, Aristud fue suspendido por el Superintendente por diez (10) días. También en marzo de 1984, después que ocurrieron los incidentes en el caso de autos, Aristud agredió con puños y patadas a un joven que se encontraba ingresado y esposado en el Cuartel del Precinto

---

[8] Aristud fue suspendido de empleo y sueldo por cinco (5) días en diciembre de 1982, por hechos ocurridos en abril de ese año. Dicha suspensión fue conmutada por el entonces Superintendente de la Policía de Puerto Rico Desiderio Cartagena, a cambio de que Aristud prestara servicios adicionales. El 30 de marzo de 1983 fue suspendido otra vez de empleo y sueldo por quince (15) días por hechos ocurridos en octubre de 1982. En marzo de 1983 fue suspendido nuevamente de empleo y sueldo por diez (10) días por la intervención inmoral y abusiva contra un ciudadano en enero de 1983.

116 de Carolina por violación de la Ley de Armas de Puerto Rico. Aristud estuvo golpeando al joven hasta que lo dejó tirado en el piso vomitando sangre.

De la narración anterior y de la prueba documental incluida en los autos originales se desprende que los demandantes no probaron que Rosa Castro tuviera conocimiento previo de *varios actos* violentos o abusivos de Aristud y Lacén contra ciudadanos, o que estuviera presente en alguna de esas ocasiones. La prueba refleja que con anterioridad a los hechos de este caso, Rosa Castro tuvo conocimiento solamente de un incidente aislado en que Lacén presentó una denuncia infundada contra un ciudadano que había presentado una queja en su contra. Como ya vimos, Rosa Castro ordenó una investigación del incidente y, una vez recibió el informe correspondiente, recomendó una suspensión de empleo y sueldo por sesenta (60) días. Fue el Superintendente quien no aceptó esta recomendación y, en su lugar, lo suspendió por un período de treinta (30) días. En cuanto a los incidentes acaecidos en la División de Drogas y Narcóticos de Carolina, no se presentó prueba de que Rosa Castro tuviese conocimiento de las agresiones imputadas por el Teniente Álvarez Díaz y que dieran lugar al traslado ordenado por el entonces Comandante de Área, Teniente Coronel Catalino Hernández Class.

Concluimos, pues, que el expediente está huérfano de evidencia que demuestre que·en las circunstancias peculiares de autos el codemandado Rosa Castro incurriera en la indiferencia imprudente o insensible necesaria para imponerle responsabilidad personal según la Ley federal de Derechos Civiles por sus actuaciones en calidad de Comandante de Área.

■ Esto no implica que un comandante de Área o un supervisor directo de los policías esté exento de responsabilidad por sus actos u omisiones en la supervisión de sus subalternos. Pero para que se le imponga responsabilidad

es necesario que sus actos demuestren una indiferencia imprudente o insensible y que exista un ligamen causal afirmativo entre su conducta y el daño por el cual se reclama.

## IV

El Procurador General también aduce que el foro de instancia erró al imponerle responsabilidad al Estado de acuerdo con los Arts. 1802 y 1803 del Código Civil, *supra.* Además, sostiene que no puede existir solidaridad entre el E.L.A., Rosa Castro, Aristud y Lacén, pues a tenor con lo dispuesto en el Art. 6 de la Ley de Reclamaciones y Demandas contra el Estado, *supra*, el E.L.A. no responde por los actos intencionales de sus agentes.

 Al evaluar este señalamiento partimos de la premisa de que la Ley federal de Derechos Civiles no precluye las acciones estatales fundadas en la responsabilidad extracontractual. El Tribunal Supremo federal expresamente ha reconocido esta dualidad de remedios:[9]

> Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. *Daniels v. Williams*, supra, pág. 332.

Estamos, pues, en completa libertad para determinar la responsabilidad del Estado por las actuaciones negligentes de sus agentes dentro del marco de nuestro derecho civil de las obligaciones extracontractuales, Arts. 1802 y 1803 del Código Civil, *supra*, y con independencia del criterio que se

---

[9] Véanse, como ejemplo de la creciente utilización de esta dualidad de remedios en los tribunales estatales: *Kedzior v. County of Hennepin*, 1991 W.L. 53972 (Minn. App.); *Grant v. City of Twin Falls*, 813 P.2d 880 (Idaho 1991); *Hill v. Columbia County*, 1991 W.L. 195885 (Wis. App.)d; *Moore v. City of Lewison*, 1991 W.L. 163028 (Me.); *Mosher v. City of Lakewood*, 807 P.2d 1235 (App. Colo. 1991).

impone al amparo de la sec. 1983 de la Ley federal de Derechos Civiles, *supra*, en torno a la responsabilidad personal de agentes del Estado que se desempeñan como supervisores.

En sus escritos, los demandantes sostienen que les violaron los derechos que les garantiza la Constitución del E.L.A. y exigen un resarcimiento por ello al amparo del Art. 1802 del Código Civil, *supra*. Anteriormente reconocimos "que el concepto de culpa del Art. 1802 es tan infinitamente amplio como la conducta de los seres humanos e incluye cualquier falta de una persona que produce un mal o daño". *Colón v. Romero Barceló*, 112 D.P.R. 573, 579 (1982). Véase, además, *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305 (1970). Nuestro Código Civil reconoce la responsabilidad del Estado a base de la doctrina de responsabilidad vicaria. Sin embargo, en vista de las disposiciones de la Ley de Reclamaciones y Demandas contra el Estado, que establecen limitaciones a la renuncia de inmunidad del soberano, es preciso examinar si procede una demanda en contra del E.L.A. por lo ocurrido en el caso de autos.

■ Mediante la aprobación de la Ley Núm. 104, *supra*, Ley de Reclamaciones y Demandas contra el Estado, la Asamblea Legislativa autorizó la presentación de demandas contra el Estado por las actuaciones culposas o negligentes de sus empleados, funcionarios o agentes en el desempeño de sus funciones y actuando en capacidad oficial. El Art. 2(a) de la Ley Núm. 104, *supra*, dispone, en lo pertinente:

> Se autoriza demandar al Estado Libre Asociado de Puerto Rico ante el Tribunal de Primera Instancia de Puerto Rico por las siguientes causas:
> (a) *Acciones por daños y perjuicios a la persona o a la propiedad* hasta la suma de setenta y cinco mil (75,000) dólares *causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo*

*interviniendo culpa o negligencia.* (Énfasis suplido.) 32 L.P.R.A. sec. 3077(a).

A tenor con esta ley, para que un demandante pueda prevalecer en un pleito de daños y perjuicios contra el Estado por los actos u omisiones de un empleado, agente o funcionario es necesario que pruebe la concurrencia de varios elementos. Primero, tiene que probar que la persona que le causó el daño era agente, funcionario o empleado del Estado y que estaba actuando en su capacidad oficial al momento de causarle el daño. Hay que establecer "suficiente nexo jurídico entre la actuación negligente del policía y los intereses del Estado por razón del ejercicio de funciones expresas o implícitas". *Sánchez Soto v. E.L.A.*, 128 D.P.R. 497, 506 (1991). Segundo, es necesario que el demandante pruebe que ese agente, funcionario o empleado actuó dentro del marco de su función. *Rodríquez v. Pueblo*, 75 D.P.R. 401 (1953). En tercer lugar, el demandante tiene que probar que la actuación del empleado del E.L.A. fue negligente y no intencional. Por último, hay que demostrar relación causal entre la conducta culposa y el daño producido. Art. 6(d) de la Ley Núm. 104, *supra*, 32 L.P.R.A. sec. 3081(d). Véanse, además: *Montes v. Fondo del Seguro del Estado*, 87 D.P.R. 199, 206 y 207 (1963); *Meléndez v. E.L.A.*, 81 D.P.R. 824, 828 (1960).

Cumplidos estos requisitos, el E.L.A. está sujeto a responsabilidad en cualquiera de los supuestos siguientes: (1) cuando el empleado, agente o funcionario causa un daño *por su exclusiva culpa o negligencia* mientras desempeña sus funciones y actúa en su capacidad oficial; (2) cuando el empleado, agente o funcionario causa un daño mientras desempeña sus funciones y actúa en su capacidad oficial por una actuación preponderantemente negligente, aun cuando dicha conducta tenga algunos elementos intencionales (*Galarza Soto v. E.L.A.*, 109 D.P.R. 179 (1979); *Morales Garay v. Roldán Coss*, 110 D.P.R. 701 (1981)); (3)

cuando, a pesar de que el daño fue directamente producido por un acto enteramente *intencional* de los cuales no responde el Estado, hubo otros *actos negligentes separados* de cocausantes del daño por los cuales sí debe responder el Estado (*Negrón v. Orozco Rivera*, 113 D.P.R. 712 (1983); *Hernández v. E.L.A.*, 116 D.P.R. 293 (1985)), y (4) *cuando el Estado a través de sus agentes es negligente* por omisión al incumplir con un deber impuesto por las leyes y la Constitución.

En cuanto a la última modalidad, se reconoce la responsabilidad directa del Estado por no tomar las medidas necesarias para supervisar de manera estricta aquellas actividades o personas que se podría prever causarían daño. Véase *Baralt et al. v. E.L.A.*, 83 D.P.R. 277 (1961).

Cuando también está involucrado un acto intencional de un subalterno, hay que examinar si el motivo intencional que produjo directamente el daño puede catalogarse como un elemento interventor lo suficientemente fuerte como para romper la cadena de causalidad comenzada con la negligencia de aquellos a quienes correspondía el deber de supervisarle.

En *Negrón v. Orozco Rivera*, supra, resolvimos que el Estado no responde del acto de un policía que intencionalmente dispara y causa la muerte a un ciudadano en el cuartel. Pero sí debe responder vicariamente por la omisión negligente, separada y distinta de otros policías que debieron prever el daño y no tomaron las medidas cautelares pertinentes para evitarlo. Posteriormente, en *Hernández v. E.L.A.*, supra, resolvimos que constituye fundamento suficiente para imponerle responsabilidad al E.L.A. la omisión del Superintendente al no actuar con la debida diligencia y despojar del arma de reglamento a un agente quien, dada su conocida condición mental, era previsible que hiciera mal uso de ella. También hemos resuelto que la Universidad de Puerto Rico responde por los daños ocasionados por el acto intencional de un tercero extraño cuando,

a pesar de que ese daño es previsible, la Universidad incumple con su deber de ofrecer adecuada protección y seguridad a sus estudiantes, convirtiéndose esta omisión en la causa adecuada del daño. *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990).

De lo anterior podemos colegir que el hecho de que el daño haya sido directamente causado por actos intencionales de subalternos no implica, automáticamente, ausencia de responsabilidad por parte del E.L.A. a través de aquellos agentes del Estado que estaban en posición y tenían el deber de evitar el daño y negligentemente omitieron hacerlo. Basta que la actuación de los subalternos fuera prevista o previsible, aun cuando fuera intencional. Concluir lo contrario sería darle inmunidad absoluta al E.L.A. en casos en los cuales el acto intencional no fue la única causa del daño, en contravención a los principios generales de responsabilidad extracontractual. Esta norma, claro está, no despoja al Estado de su manto de inmunidad en aquellos casos en que el acto intencional del empleado público fue un incidente aislado imprevisible por sus supervisores o que no se pueda establecer suficiente nexo entre las actuaciones del agente y los intereses del Estado. *Sánchez Soto v. E.L.A.*, supra.

En el caso particular de la Policía, la naturaleza de su responsabilidad requiere la adopción de esta norma. La Policía es el cuerpo de ciudadanos que el Estado ha escogido como guardianes del orden público y están autorizados a investigar los actos delictivos y arrestar a sospechosos. También están facultados para poseer y portar armas y para utilizarlas en el desempeño de sus funciones. Ahora bien, cuando so color de autoridad un policía comete actos criminales contrarios a la ley, se desvanece por completo esta confianza pública. Por lo tanto, los derechos de los ciudadanos perjudicados deben ser vindicados. Véase *Mary M. v. City of Los Angeles*, 814 P.2d 1341 (Cal. 1991).

# V

De un examen de los autos originales es forzoso concluir que el E.L.A. responde vicariamente de los daños causados a los demandantes. Esta responsabilidad no nace de los actos intencionales de los policías Lacén y Aristud, sino de las omisiones negligentes del Superintendente, quien teniendo el deber de supervisar y la facultad legal de disciplinar a sus subalternos Aristud y Lacén, no evitó que éstos incurrieran en en conducta dañina previsible y evitable.

Los aspirantes a ser miembros de la Policía deben pasar por un proceso de evaluación que incluye exámenes médicos y pruebas escritas u orales, físicas o de ejecución. Reglamento de Personal, *supra*, Sec. 12.5. Los aspirantes que aprueben los exámenes serán considerados elegibles para ingresar al Cuerpo. Íd., Sec. 12.6. No obstante, ello no determina su ingreso automático. Es el Superintendente quien tiene la facultad de nombrar los miembros de la Policía y quien autoriza o deniega la certificación de los miembros elegibles a sus puestos. Íd., Sec. 12.7(b). Es también el Superintendente quien, como administrador y director de la Policía, tiene el deber de velar por que ésta desarrolle programas de adiestramiento para atender las necesidades particulares del Cuerpo y el desarrollo saludable de sus miembros como servidores públicos. Íd., Secs. 15.3(b) y 18.1–18.3.

Por otro lado, tanto la Ley de la Policía de Puerto Rico de 1974 como el reglamento de dicho Cuerpo imponen al Superintendente la facultad y el deber de tomar las medidas correctivas necesarias cuando la conducta de uno de sus miembros no se ajuste a las normas establecidas. Es él quien ha de iniciar la investigación de posibles faltas, formular y notificar cargos por escrito. Tiene, además, la facultad de imponer sanciones que conlleven la suspensión de empleo y sueldo e, incluso, la expulsión permanente del

Cuerpo, y puede alterar o hasta dejar sin efecto cualquier sanción que recomiende un supervisor. Véanse: Arts. 13–14 de la Ley Núm. 26 de 22 de agosto de 1974 (25 L.P.R.A. secs. 1013–1014); Reglamento de Personal, Sec. 14.3; Boletín de Derechos Civiles, *supra*, pág. 7.

En vista de este esquema es inescapable la conclusión de que en este caso el Superintendente tenía la facultad legal para evitar el daño. Pudo y debió denegar la admisión de Lacén por no haber pasado los exámenes sicológicos, debió tomar medidas disciplinarias contra Aristud y Lacén por haber abusado de la ciudadanía (a quienes como miembros de la Policía les correspondía proteger) y debió proveerles readiestramiento y orientación correctiva para evitar que la conducta lesiva se repitiera.

En efecto, la prueba sí demuestra que desde 1982 el Superintendente tenía conocimiento de los problemas de conducta de Aristud. También refleja que un informe preparado en 1982 para el Director del Negociado reveló que Aristud y Lacén crearon muchos problemas en la División de Drogas y Narcóticos de Carolina por su conducta agresiva contra los ciudadanos. A pesar de esta información, el Superintendente no tomó medidas correctivas para evitar la repetición de estos actos.

En vista de que el historial de estos agentes mostraba un patrón de conducta lesiva a los derechos constitucionales de la ciudadanía, era previsible que volvieran a cometer nuevos actos de violencia y utilizaran sus posiciones para acusar injustamente a ciudadanos y encubrir luego sus actuaciones ilegales. No se trataba de actos aislados en unos historiales de servicio público caracterizados por una conducta intachable. Considerando sus antecedentes, el Superintendente Cartagena debió proveer un adiestramiento especial a estos agentes sobre los derechos de los ciudadanos y los métodos investigativos autorizados por el ordenamiento constitucional. *Canton v. Harris*, 489 U.S. 378. Véase, también, Anotación, *Liability of Supervisory Offi-*

*cials and Governmental Entities for Having Failed to Adequately Train, Supervise, or Control Individual Peace Officers Who Violate Plaintiff's Civil Rights Under 42 USCS sec. 1983,* 70 A.L.R.Fed. 17 (1984). Además, debió requerirles pruebas sicológicas para determinar si estaban aptos para continuar desempeñando sus cargos.

De haberse ejercido por el Superintendente una supervisión más estricta y adecuada, y si se hubiesen tomado las medidas cautelares que requerían las circunstancias particulares de estos oficiales, existe una certeza razonable de que Aristud y Lacén no hubiesen utilizado sus posiciones como agentes de la Policía para agredir y arrestar a Leyva Ramos y acusarlo de agresión contra un funcionario público, a sabiendas de que los hechos imputados eran falsos.(¹⁰)

Al examinar los hechos a la luz del derecho vigente, no existe duda en cuanto a que se cumplen los dos (2) primeros requisitos que impone la Ley Núm. 104, *supra*, para que proceda la interposición de una demanda contra el Estado. El Superintendente es el funcionario público que tiene el deber de implantar la disciplina de los miembros de ese Cuerpo. Por ende, sus actos y omisiones ocurrieron mientras actuaba en su capacidad oficial y dentro del marco de sus funciones. Como actuó en representación del Estado, hubo la acción de estado requerida para que el demandante pudiera oponerle los derechos constitucionales que le asisten. Por ser previsibles y evitables estos hechos, los actos intencionales de Lacén y Aristud no constituyen una causa interventora suficiente como para romper

---

(¹⁰) Este caso demuestra que existe la necesidad de que en la Policía se establezca un sistema mediante el cual se pueda recopilar de manera efectiva toda la información relacionada con la conducta y con las actuaciones de los miembros de la Uniformada, de forma tal que ésta esté disponible cuando se vayan a tomar las medidas disciplinarias, correctivas o de cualquier naturaleza que afecten al agente y/o a la Policía. Del expediente parece surgir que no existe este sistema de información efectiva y que esto pudo haber contribuido a que no se tomaran contra Aristud y Lacén las medidas apropiadas para evitar los daños.

la cadena de causalidad que comenzó con la omisión negligente del Superintendente. Esta última fue la causa adecuada del daño de los demandantes.

## VI

El Procurador General también sostiene que el Tribunal Superior incurrió en error al imponerle responsabilidad al Estado y al Teniente Rosa Castro, en su carácter oficial, por violar la Ley federal de Derechos Civiles. Ya hemos determinado que, a la luz de los hechos particulares de este caso, Rosa Castro no responde conforme dicha ley en su carácter personal. Esto de por sí no basta para disponer del señalamiento en cuestión, que se refiere a la responsabilidad según dicha ley de los funcionarios estatales en su carácter oficial y a la del Estado propiamente.

A base de un examen de la jurisprudencia federal aplicable, concluimos que es meritorio este señalamiento. Los Estados no son considerados "persona" al amparo de la sec. 1983 de la Ley federal de Derechos Civiles, *supra*, y no procede demandar en su contra según este estatuto. *Will v. Michigan Department of State Police*, 491 U.S. 58, 64 (1989); *Howlett v. Rose*, supra. Tampoco procede una acción de acuerdo con la citada sec. 1983 contra un funcionario estatal que es demandado en su carácter oficial. *Will v. Michigan Department of State Police*, supra; *Barreto Fred v. Aponte Roque*, 916 F.2d 37, 39 n.3 (1er Cir. 1990); *Forte v. Sullivan*, No. 90–2159, slip. op. (1er Cir. mayo 16, 1988).

Se revoca el dictamen de instancia en estos extremos.

## VII

Por último, el Procurador General aduce que no procede la imposición de honorarios de abogado solidariamente al E.L.A. y al Teniente Coronel Rosa Castro conforme la Ley federal de Derechos Civiles.

En vista del resultado al que llegamos en cuanto a la responsabilidad de Rosa Castro en el caso particular que nos ocupa, y dado que el Estado no es persona según la Ley federal de Derechos Civiles, procede revocar la sentencia recurrida en cuanto impone honorarios contra Rosa Castro y contra el E.L.A.

## VIII

En conclusión, *revocamos el dictamen de instancia en la medida en que determinó responsabilidad personal del Teniente Rosa Castro en el desempeño de su cargo en conformidad con la sec. 1983 de la Ley federal de Derechos Civiles, supra, y en cuanto impuso responsabilidad solidaria y honorarios de abogado al E.L.A. y al Teniente Rosa Castro en su capacidad oficial de acuerdo con dicha ley. Sin embargo, concluimos que según los Arts. 1802 y 1803 del Código Civil, supra, y la Ley Núm. 104, supra, existe responsabilidad vicaria del Estado por las actuaciones negligentes del Superintendente.*

*Se dictará sentencia de conformidad con esta opinión.*

El Juez Asociado Señor Fuster Berlingeri no intervino.